[No. 5545.]

## JOHN A. WILLS v. ALEXANDER AUSTIN, TAX COLLECTOR OF THE CITY AND COUNTY OF SAN FRANCISCO.

DURESS—VOID TAX DEED.—A tax deed which is void upon its face does not throw a cloud upon the title, and a threat by the Tax Collector to sell property and execute such a deed, does not amount to duress.

HOUGHTON v. AUSTIN EXPLAINED. — The logical result of the decision in *Houghton* v. *Austin,* (47 Cal. 646,) is that the whole of sec. 3696 of the Political Code is unconstitutional and void, *per se.*

STATUTES—UNCONSTITUTIONAL IN PART.—If the parts of a statute are so mutually connected with, and dependent on each other, as conditions, considerations, or compensations for each other, as to warrant a belief that the Legislature intended them as a whole, and if all could not be carried out, would not have passed any, and some parts are unconstitutional, all the provisions which are thus dependent, conditional, or connected, must fall with them.

TAX DEED VOID ON ITS FACE—A tax deed for State taxes purporting to have been levied for the fiscal year 1872-3, when, under the decisions of the Supreme Court, there was no valid law authorizing a State tax to be levied for that year, would be void on its face, so far as it related to the State tax.

SALE FOR TAXES, ILLEGAL IN PART.—If land be sold for taxes, a part of which are valid and a part illegal, the whole sale and the tax deed will be void.

PAYMENT OF TAXES UNDER INEFFECTUAL PROTEST.—The payment of taxes when there is no legal duress, will be deemed to have been voluntary, and the money cannot be recovered back.

APPEAL from the District Court of the Fifteenth Judicial District.

The action was for money had and received, and was brought to recover back three hundred and fifty-one dollars paid under protest to the defendant, who was the Tax Collector of the City and County of San Francisco, as taxes on certain real estate owned by the plaintiff, levied for State, City and County purposes for the fiscal year 1872-3. The complaint alleged, that the defendant in his official capacity. had asserted that the taxes were legally assessed and levied; that he threatened the plaintiff that unless the taxes were paid on or before the first Monday in January, 1873, he, the defendant, would add thereto the sum of five per cent.; that he would return the assessment and taxes as delinquent, and would advertise the property in the delinquent list and sell the same for nonpayment of taxes, and that in order to avoid the cost and the cloud that would

thus be cast upon the property, he had paid the taxes under protest.

At the trial, the plaintiff, for the purpose of showing that a tax title, although understood to be illegal, operates as a cloud upon the title of real estate, introduced the testimony of A. J. Gunnison, as follows:

"I have been in the practice of law, and in connection with my business have been in partnership with other men most of the time, the last twenty-odd years, in searching titles, and also passing upon titles for purchasers, and have also dealt largely in real estate. Q. You have made that a specialty? A. Yes, sir; rather special; passing upon titles. Q. So you are familiar with the titles to real estate in this city and county? A. I am quite familiar with the titles in this city and county, and have passed upon an immense amount of property. Q. You have passed upon it for the purpose of negotiating sales and loans? A. Where persons have purchased property or expected to buy it, I have passed upon it to see whether the title was sufficient; and on my recommendation they have decided whether they would take the property or not. Q. What is the effect of a tax title, even although understood to be illegal, on the negotiability of a title—on the value of the property? A. I have found during the time that I have been engaged in the business, that whenever an outstanding tax title appears upon the record, or that the taxes have not been paid, and a sale has been made, that at least four out of five persons purchasing refused to purchase the property, not wishing to take the risk. Even when I told them that the tax title for that year, or that particular tax title, had been declared illegal by the Courts of the State, they would not take the property, for they considered the liability that a change in opinion might arise, and so refused to purchase the property. *The Court*—Q. When sales were made, and they took the property under those circumstances, did they pay the intrinsic value of the property? If not, what per centage less than the intrinsic value of the property? A. Generally, a person who would object to it on that account, would refuse to take it at any price. *Mr. Felton*—Q. So that would render it unsaleable? A. It would render it unsaleable;

I do not know of persons deducting anything on that account, because they would refuse to take the property, for they had not implicit reliance upon the decisions that had been made. Q. In your opinion, then, it would diminish materially the marketable value of the property? A. It would; it does diminish its marketable value; it is not salable—does not meet with that ready sale it otherwise would. Q. So that a man, in order to sell his property, is obliged to make a considerable sacrifice? A. I will state this: That very often where parties may have made some deduction on account of some illegal taxes, they might be able, if they took the trouble, possibly to deduct enough so as to compromise with the persons claiming the outstanding title. *The Court*—Q. Then there were some instances where they did compromise? A. There were some instances where they compromised; it is often the case. Often the parties that were selling would have to go and spend some money to get up that title before the purchaser would take a conveyance of their property."

The testimony was not contradicted. Judgment was rendered for the plaintiff, and the defendant appealed.

[This case, together with No. 5546, *Merrill v. Austin*, No. 5547, *Mahe* v. *Austin*, No. 5548, *McCarthy* v. *Austin*, No. 5550, *Teschemacher* v. *Austin*, No. 5549, *De Fremery* v. *Austin*, were known as the "contested tax cases." They were test cases selected out of one hundred and five cases brought to recover back some two hundred and seventy-eight thousand dollars tax money paid under protest.—*Reporter.*]

*W. C. Burnett*, City and County Attorney, for Appellant, after pointing out the particulars in which the cases differed— some being for a tax on real estate alone, others for a tax on personal property exclusively, others for a tax on solvent debts, and others again for solvent debts arising out of the sale of goods imported and sold in the original packages—made the following points:

Any payments made on the first Monday of January, 1873, were necessarily voluntary, because sec. 3757 of the Political Code was then in operation, and provided that "no taxes must

be collected or received from the first to the third Monday of January, inclusive, in each year." During that period there was no mode of compulsion or coercion which the Tax Collector could employ.

In numbers 5550, 5545, 5546, and 5547, respondents have no cause of action because of the fact that the taxes were not delinquent when paid, and there could not be compulsion or coercion. The 6th was the first Monday of January, 1873. ( *Williams* v. *Corcoran*, 46 Cal. 553, 556 ; Political Code, secs. 3746, 3749, 3756, and 3768.)

There was no compulsion or coercion in law, or by force of the statute itself, irrespective of the supposed acts or threats of the Tax Collector alleged in the complaints, at any time before the taxes were delinquent, if ever. ( *a.*)—If sec. 3696 of the Political Code is unconstitutional, and the Board of Equalization had no authority by the terms of that section to fix the rate of the State tax, otherwise than by doing an unconstitutional act, to wit, allowing for delinquency in the collection of taxes, and this Court shall so hold in this case ; then, we submit that the fact of the invalidity of the State tax would have appeared upon the face of a tax deed executed upon a sale for the State and municipal taxes mentioned in the complaint, and the deed, if offered in proof, would be ruled out as not being *prima facie* evidence that the State tax was levied in accordance with law ; and there being, therefore, no power in the Tax Collector to cloud the plaintiff's title, he could not do any act amounting to compulsion or coercion. (Political Code, secs. 3776, 3786, 3787, 3788, 3696 ; *Houghton* v. *Austin*, 47 Cal. 646, 650, 652, 659, 665, 666.) ( *b.*)—If, on the other hand, sec. 3696 is constitutional, the tax was legal, and it was plaintiff's duty to pay it.

The unconstitutionality of sec. 3696 of the Political Code having rendered the whole of the State tax void, so that every person was bound to take notice of its invalidity, and made it impossible to execute a tax deed that would apparently give title, upon a sale for State and municipal taxes in one gross sum as such taxes were carried out in the Assessment Roll in the hands of appellant, it thereby became impossible that there

should be compulsion or coercion otherwise than by a levy upon and taking possession of personal property, and holding the same in custody.

There having been no compulsion or coercion coming from the Tax Collector to whom the payments were made, plaintiffs ought not to recover. (*Bucknall* v. *Story*, 46 Cal. 589, 598, etc.; *Williams* v. *Corcoran*, 46 Cal. 553, 556.)

An admission that a sale of lands for supposed taxes, a part of which were valid and a part void, and a deed executed in pursuance of the sale, would not convey title, but that the sale would be bad, does not at all conflict with the point we now make, that upon a payment of taxes under protest, even where there is coercion, that part of the tax which is legal cannot be recovered back. (*Bank of Mendocino* v. *Chalfant*, 51 Cal. 369.) And the Tax Collector, or the Court, may make a mathematical calculation, and separate the legal from the illegal portion of the total carried out, for any proper purpose. (Ibid.)

In *Mason* v. *Johnson*, 51 Cal. 612, the deed of the Marshall, *ex officio* the Tax Collector, would have conveyed an apparent title, which would have clouded Mason's title, because it might have required proof to show that the lands were situate without the old City of Oakland. It would not have been necessary to have described the lands as within the old town of Brooklyn. The defect was known to defendant in *Mason* v. *Johnson*, as matter of law, so that under *Meek* v. *McClure* it was not necessary that the ground of protest should be stated; and as plaintiff's title would be clouded, there was jeopardy.

Plaintiffs should have notified defendant of the grounds of protest, other than with respect to the illegality of the State Board of Equalization, and their acts in making the State levy. (*Meek* v. *McClure*, 49 Cal. 623.)

*George B. Merrill* and *Cope & Boyd*, for Respondent.

The payment was involuntary and under coercion and duress. The defendant had given notice, in accordance with the Code, and had threatened that unless the taxes were paid on or before the first Monday in January, 1873, he would add five per cent. thereto, and that unless the whole amount thereof was paid on

or before the first Monday of February, 1873, he would sell the personal property of plaintiff. Moreover, the tax had the effect of a judgment; and it was a lien upon the real property of the persons taxed. (Pol. Code, secs. 3670, 3714, 3715, 3716, 3717, 3718, 3728, 3732, 3746, 3756, 3764, 3765, 3768, 3757, 3886–7, 3803, 3807, 3881, 3885; Code C. P. sec. 1963, sub. 15; *Bucknall* v. *Story,* 46 Cal. 600; *Peyser* v. *Mayor of New York,* S. F. Law Journal, vol. 1, No. 10, p. 154; *Boston & Sandwich Glass Co.* v. *City of Boston,* 4 Met. 181; *Joyner* v. *Third Sch. Dist.* 3 Cush. 567; *First Nat'l. Bk.* v. *Watkins,* 21 Mich. 483; *Atwell* v. *Zuloff,* 26 Mich. 118; *Hubbard* v. *Brainard,* 35 Conn. 567; *Maxwell* v. *Griswold,* 10 How. 243; *Ripley* v. *Gelston,* 9 Johns. 201; *Hearsey* v. *Pryn,* 7 Id. 179; *Greene-baum* v. *King,* 4 Kans. 332; Cooley on Taxation, p. 569.) As the assessment was regular upon its face, a deed after sale by the Tax Collector would create a cloud upon the title of lands sold. (Tr. fols.. 397–405; *Pixley* v. *Huggins,* 15 Cal. 133; *Fulton* v. *Hanlon,* 20 Id. 483–4.)

*Cowles & Drown,* also for Respondent, relied mainly upon the opinion of Judge Dwinelle, of the District Court, which, upon the question of duress, was as follows:

"It is necessary to consider the situation of the plaintiffs in reference to the demand for said sum for alleged taxes, to determine whether or not they paid the same under coercion, duress, or compulsion. The Political Code provides that all property within this State, except the property of the United States, of the State, and municipal corporations, is subject to taxation. (Sec. 3607.) That the Board of Supervisors shall annually, on the first Monday of October, fix the rate of taxes for city and county purposes, and must levy the city and county taxes upon the taxable property of the county. (Sec. 3714.) Every tax has the effect of a judgment against the person, and every lien created by such tax has the force and effect of an execution duly levied against all property of the delinquent, and the judgment is not satisfied nor the lien removed until the taxes are paid, or the property sold for the payment thereof. (Sec. 3716.) Every tax due upon personal property is a lien upon the real property of the owner thereof from and after the time the personal prop-

erty is assessed. (Sec. 3717.) The Assessor must before the first Monday in July in each year assess all property subject to taxation. (Sec. 3628.) Before the fourth Monday of October of each year the Auditor must deliver to the Tax Collector a 'duplicate assessment book.' (Sec. 3732.) Within ten days after the receipt of the 'duplicate assessment book,' the Tax Collector must publish a notice that the taxes will become delinquent on the first Monday of January thereafter; and unless paid prior thereto, five per cent. will be added to the amount thereof, and of the time and place at which payment of taxes may be made. (Sec. 3746.) On the first Monday in January of each year all unpaid taxes are delinquent, and thereafter the Tax Collector must collect thereon, for the use of the county, an addition of five per cent. (Sec. 3756.) The Tax Collector must, on or before the first Monday of February in each year, publish the delinquent list, (sec. 3764) and a notice that unless the taxes delinquent, together with the costs and percentage, are paid, the real property upon which such taxes are a lien will be sold at public auction, (sec. 3765) the sale to be not less than twenty-one nor more than twenty-eight days from the first publication of the sale. (Sec. 3768.) The assessment and tax of and against the personal property of the plaintiffs being void, they ought not to be compelled to pay it; but under the foregoing provisions, if the respective officers performed their duties, as the Court is bound to believe they did until the contrary is shown, (Code of Procedure, sec. 1963, sub. 15) they find the tax to the extent of fifteen hundred dollars was levied upon their personal property on the first Monday in October, 1872, and was a lien upon all of their property—real, if they had any, as well as personal—for three months prior to the levy; and that such levy had the effect of a judgment and execution against all their property; that if said sum was not paid before the first Monday of January, 1873, five per cent. would be added to the amount of the illegal tax, and if not paid in February thereafter, their property already levied upon would be sold, perhaps at great sacrifice; and knowing, too, they could not find relief against or prevent the proposed sale by application to a Court of Equity for an injunction to stay the proposed sale

until their rights could be ascertained and determined, as they could do if the sale was to be made on an execution issued out of a Court of Justice on a void judgment, for an injunction will not be granted to restrain the collection of a tax by the sale of the property of a tax-payer, (*Houghton* v. *Austin*, 47 Cal. 646) they came forward and paid the illegal tax. In my opinion, they paid the tax under coercion, duress, and upon compulsion. It is suggested they should not have relief because they paid the tax before the Tax Collector did some act toward offering the property for sale; but I can see no force in the suggestion—they did what prudent men would do under the circumstances; they found their property levied upon on a tax which had the effect of a judgment-lien, and if not paid immediately, their property would be encumbered by an additional five per cent. and the costs and expenses to be incurred preparatory to sale. But my opinion as to the payment having been compulsory, is sustained by authority, no less than the Supreme Court of the State of Massachusetts. It was in an action brought to recover back money illegally assessed and paid to the Tax Collector of the City of Boston, and is a case almost parallel with the one now under consideration." (*The Boston & Sandwich Glass Co.* v. *City of Boston*, 4 Met. 181.)

*Geo. B. Merrill* and *W. H. Patterson*, also for Respondent.

The question which has been made the test of the plaintiff's right to recover is, whether or not the payment was made under duress. The test of duress is, whether the deed made by the Tax Collector for the tax-payer's land, sold for the taxes assessed, would have been void upon its face. While there is great argument against that being the only test, we do not see how the question can be answered other than in the negative.

The tax deed would have contained the recitations of the statute, and on its face, as on the assessment rolls, nothing would or could have appeared irregular. We speak now of the tax deed, without reference to the adjudication of the illegality of the tax afterwards decided by the case of *Houghton* v. *Austin*. The illegality of the tax assessment had to be shown by evidence *aliunde* of the record. Nothing therein gave clue

to the irregular and unlawful action of the Board of Equaliza-
tion, which action, under the statute, this Court afterwards de-
clared unconstitutional and void.   Nothing therein gave evidence
of the utter illegality of the tax levied in behalf of the City
and County of San Francisco, by reason of the irregular and
unlawful action of the Board of Supervisors of this city.   It
was these irregularities and illegalities which made the tax
illegal and void; but not one of them appeared upon the face of
the assessment roll, or could appear upon the certificate of sale
or the Tax Collector's deed.   They had all to be probed for and
extorted from the breasts of officious officials, who had presump-
tuously, or ignorantly, done those acts of which tax-payers com-
plained, and by reason of which this Court declared the tax illegal
and void.   The deed, of course, would show that it was for sale
of land for taxes for the fiscal year 1872–3, but nothing in the
record showed that the taxes for that year were not legal.   To
show it, one must come with testimony *dehors* the record.

This was certainly true then, and for a period of at least one
year and one month afterwards, until the decision in *Houghton*
v. *Austin*, in March, 1874.   Since that time, possibly the
Courts would recognize the illegality of such taxes as were
passed upon in the case of *Houghton* v. *Austin* ; but in any case
that should have arisen after that decision, would not the parties
be compelled to introduce some evidence to show that the cir-
cumstances, the taxes, etc., upon which the deed was based,
were the same as those passed upon in *Houghton* v. *Austin?*
We think so, and that in any event the Court and counsel might
say that the decision in that case was the law of that case, and
that case only, and was not the law of any other case, unless it
should be shown that the facts in this case were the same as
in that case, wherein, to prove them, evidence *aliunde* the
record had to be offered in Court.

But it is said the deed would have been void upon its face,
because it " would have shown that on its face it was for a
State tax purporting to have been levied for the fiscal year of
1872–3 ; whereas, as has been shown, there was no valid law
authorizing a State tax to be levied or collected for that year."

In the first place, we beg to say that it has not " been shown

that there was no valid law authorizing a State tax to be levied or collected for that year," i. e., by the case of *Houghton* v. *Austin*, but simply that there was an invalid law therefor, and, if action was taken under that law, such action must be null and void. We suppose it will not be contended that a valid State tax might not easily enough have been levied for that year, but not in the way the Board of Equalization proceeded that year. So that even though the deed showed that it originated in a levy of taxes for the year 1872–3, it would not then appear to be void, until shown by evidence *aliunde* the record that that tax was levied in accordance with the provisions of this unconstitutional law.

And, secondly: as we are making this examination to ascertain whether or not there was duress at the time of the payment of the tax in the month of January, 1873, we respectfully submit that we must determine that only by what facts existed and what law prevailed at that time. From this examination, is it not holding tax payers to an unreasonable responsibility and foresight, to expect them to know what laws a Court in future may hold to be unconstitutional? The presumption of a knowledge of the law does not reach to a knowledge of the unconstitutionality of a law. The presumptions are exactly opposite, and are always in favor of their constitutionality. In our view, the decision in *Houghton* v. *Austin* can have no possible weight in determining the question of duress, or of the voluntary or involuntary character of the payment. Because:

1. The payment of the taxes under protest was made in the month of January, 1873.

2. The sale for delinquent taxes for the year 1872–3 would and did take place according to law then in force, in the month of February, 1873. (Political Code, secs. 3764, 3768.)

3. The deed by the Tax Collector for lands sold for delinquent taxes for the year 1872–3 was by statute deliverable one year thereafter, to wit: in the month of February, 1874. (Political Code, sec. 3785.)

4. This Court did not render the decision in the case of *Houghton* v. *Austin* until the 21st day of March, A. D. 1874. Is it not plain, then, that whoever should receive a deed of a

tax-payer's land from the Tax Collector, would receive a deed
that on its face at the date of the deed, and for one month
thereafter, carried nothing which could show or hint that it
was void? But the question is concerning the law and fact a
year previous. Was there duress then?

By the test of duress in law or in fact to determine the char
acter of the payment by the tax-payers in the month of January,
1873, they are still entitled to the judgment pronounced in their
favor by the Court below.

If the test of legal duress is the legal cloud, is the test of
the legal cloud, in the answer to the question put by Mr.
Justice FIELD, in _Pixley_ v. _Huggins_, 15 Cal. 133, complete?
"Would the owner of the property in an action of ejectment
brought by the adverse party, founded upon the deed, be re-
quired to offer evidence to defeat a recovery? If such proof
would be necessary, the cloud would exist; if the proof would
be unnecessary, no shade would be cast by the presence of
the deed." Premising that while no shade would be cast by
the presence of the deed, upon the mind of a Court learned
in the law, through which they could not see as through an
unclouded sky, there would, nevertheless, be such haze and
appearance of coming darkness to the more easily obstructed
and sensitive vision of the worldly-wise, money-getting layman,
as makes afraid; yet, when the tax-payer put that test-question
to himself on that unhappy day in January, 1873, when he paid
his taxes, we submit that the only way he, or any legal coun-
sellor, could then answer it was thus:

"If my land is sold, of course I would be required to offer
evidence that the taxes levied for this year 1872–3 are illegal—
there having been no decision to the contrary, and no action
having been brought to determine that question—for the deed
will be primary evidence of their legality, under·Political Code,
sec. 3786; and by sec. 3787, the deed will be conclusive. evi-
dence of the regularity of all proceedings, unless I show to the
contrary."

The mind of the tax-payer, then, in January, 1873, was influ-
enced by. the certainty that, as the law existed then, the deed
would cast a cloud upon his title, and the fear that such would

be the case compelled him involuntarily to pay his taxes, while sec. 341 of the Code of Civil Procedure assured him that if he brought his action within six months he could recover the money paid to the Tax Collector under protest, which it is claimed ought to be refunded.

Thus only could he conclude touching the question of *legal* duress. But, beside this, was his knowledge, which also was almost every man's knowledge, beside Mr. Gunnison's, of the actual duress which came from that dismal consciousness that, if his land were sold and the deed were never so valueless in the eye of the law, that the land-buyer would avoid him and seek rather his neighbor, who seemed more lawfully to bow to the law and obediently paid his taxes, until what he gained by refusing to pay an illegal assessment would be lost from the necessity of buying out, with that, the buyer at the delinquent tax sale, in order that capital, which is proverbially "sensitive," might be at his command, as one with lands unincumbered, title undisputed, and record without the semblance of a cloud.

But we respectfully submit that the decision in the case of *Bucknall* v. *Story*, 46 Cal. 589, cannot, either by consonance of facts or application of law, sustain the defendant's position. In that case, an assessment had been made under a special law, and the Tax Collector, not by virtue of his general powers and authority, but by reason of the special statute, was made the instrument of compelling the payment of the assessment. The sections of the general revenue law did not apply to the collection, nor was the deed to be given by the Tax Collector after sale for delinquency, to be construed according to the provisions of the law regulating sales and deeds by the Tax Collector in the performance of the regular and usual duties of his office.

"No deed which the Tax Collector could make would be *prima facie* evidence *in this* case of the regularity and validity of all the proceedings resulting in the deed. This would make it cover, not the assessment alone, as in cases of ordinary tax sales, but all the proceedings which made an assessment necessary—a much broader field than the recitals of a mere Tax Collector could cover. If the purchaser should seek to recover

the land, it would not only be necessary to introduce his deed, but he would be obliged to introduce his assessment and show the regularity of the proceedings; and when the assessment, advertisement of sale, and deed are introduced, it will necessarily appear that a sale has been made for nearly a thousand dollars more than the new assessment. He could make out no *prima facie* case without disclosing upon the face of his evidence the fatal defect, and the owners of the land would not be called upon to rebut his title. There would, then, be no cloud, and there is no ground for sustaining an action for an injunction." (*Bucknall* v. *Story*, 36 Cal. 74.)

There is no likeness there to the facts of the cases at bar.

Thereupon the plaintiff sought to recover the amount of the tax paid under protest, and the Court says in 46 Cal. 600, that the plaintiffs "must be held to have known that when they paid the money a sale by the Tax Collector would be a nullity, and would not invest the purchaser with even a colorable title, as against them. There was *therefore* no legal duress or coercion, and the payment was voluntary."

We believe we are rescued from the fatal effects of that decision by the premises, wherein we are confident that we have clearly shown that in the case at bar the plaintiffs not only cannot be held to have known "that a sale would not invest the purchaser with even a colorable title, as against him," but, on the contrary, they must be held to have been absolutely certain that under the law as it *then* was the deed would have cast a substantial cloud, which could not be removed without introducing the evidence *aliunde* the record, which, indeed, was introduced upon the trial of these actions; but it is equally plain that he was fearfully conscious of that semblance of a cloud, which every Tax Collector's deed is in the eyes of the public, which, as inexorable as any real cloud, casts its depressing shadow so darkly over lands that buyers will not recognize the real owner, and the lamp of jurisprudence even cannot so brighten the record that they can find any value there.

Thus far our argument rests upon the temporary concession of soundness in the decision in the case of *Bucknall* v. *Story*, 46 Cal. 589.

But we are not content therewith, nor with the possibility of any application of the law, as therein expressed, to the cases at bar. We believe we may fairly ask this Court to reconsider and modify that decision, recalling, if we may, the fact that it was not the decision of a united Court—one Justice dissenting and one not expressing any opinion. From the very nature of the decision it can scarcely be argued that under it any serious " proprietary rights have grown up to such an extent that it will produce more of evil than of good to restore the law to its integrity," while this Court has itself given us justification herein, in declaring that " No such rule ever existed as that a Court should be absolutely bound by a previous decision." (*Houghton* v. *Austin*, 47 Cal. 668.)

The decision in the case of *Bucknall* v. *Story*, 46 Cal. 589, we believe to be anomalous. It is not, we submit, in accord with the decisions of England, the United States Supreme Court, or the rule prevailing in the several States. An injunction had been refused against the sale of the lands, because the tax deed could not create a legal cloud upon the title. But how can that possibly operate to take away the involuntary character of the payment? The decision does not tell us. It does not give a reason for itself. It recites the decisions which logically bring us to the conclusion that the action is maintainable, and surprises us by declaring a directly opposite conclusion. The State of California had, up to that time, stood in exact accord with the decisions of the most respected tribunals upon that question. And we ask the forbearance of the Court while we follow briefly the decisions of this State up to that time, as examined in *Bucknall* v. *Story*.

In *Hayes* v. *Hogan*, 5 Cal. 241, an illegal tax having been levied at the tax sale, the owner bought his own land " to prevent a cloud upon the title, and then brought an action against the Tax Collector to recover back the money." On these facts the Court said: "The right of the plaintiff to recover under the circumstances is undoubted. He protested against the sale, purchased in order to protect his property from a clouded title, and made payment under protest, and in a few days afterwards commenced his suit for the recovery of the money." If that

were the only decision in this State there could be no doubt of
our right to recover. In *McMillan* v. *Richards*, 9 Cal. 417, the
Court again declares in our favor by saying: "The object of
a protest is to take from the payment its voluntary character,
and thus conserve to the party a right of action to recover back
the money. It is available only in case of payment under
duress or coercion, or where undue advantage is taken of the
party's situation, * * * * and if action be brought, the
protest is only available as evidence of the fact of compulsion."
This case is one we should cite to show that the protest in these
cases "is available as evidence of the fact of compulsion." In
*Falkner* v. *Hunt*, 16 Cal. 167, the plaintiff paid under protest
a tax assessed on certain mortgages, and sued to recover back
the money on the ground that the tax was paid under compul-
sion and was illegal. The Court says: "If the money was
paid under protest and was not justly due, it may be recovered
back in an action of this sort," citing *Hayes* v. *Hogan*, and *Mc-
Millan* v. *Richards*.

The position of the plaintiffs is thus far strengthened by three
successive decisions of this Court. In *Guy* v. *Washburne*, 23
Cal. 113, which we find cited in the text-books and reports, in
company with many other cases to sustain the doctrine for
which we contend, the Court says: "The right of a party who
has paid money not justly due, to a Tax Collector, under pro-
test, to recover it back by action, has been sustained by this
Court, in cases of both real and personal property (citing *Hays*
v. *Hogan* and *Falkner* v. *Hunt*). We are not disposed to disturb
these decisions." The plaintiffs' case is thereby strengthened
by a series of decisions in his favor. The Court then com-
ments upon these cases, and in 46 Cal. 598, says: "These de-
cisions, except *McMillan* v. *Richards*, place the doctrine upon
the somewhat broad ground that if the tax be illegal, and is
paid under protest, it may be recovered back. They appear to
assume that the protest is sufficient evidence of compulsion to
relieve the transaction from the character of a voluntary pay-
ment. But we think the rule is more correctly stated in *Brum-
magim* v. *Tillinghast*, 18 Cal. 271:

"The illegality of the demand paid constitutes, of itself, no

ground for relief. There must be, in addition, some compulsion or coercion of the party making the payment. It is the compulsion or coercion under which the party is supposed to act which controls the conduct of the party making the payment. * * * What shall constitute the compulsion or coercion which the law will recognize as sufficient to render payments involuntary, may often be a question of difficulty. It may be said, in general, that there must be some actual or threatened exercise of power, possessed or supposed to be possessed by the party executing or receiving the payment, from which the party has no other means of immediate relief than by advancing the money." The Court then quotes with approval the opinion in *Forbes* v. *Appleton*, 5 Cush. 117, which we respectfully submit upon examination cannot sustain that decision nor operate to our prejudice, being a case of voluntary payment after sale, but it does not quote the case of *Boston & Sandwich Glass Company* v. *City of Boston*, which is one of the leading American cases upon the subject, which is cited with the greatest approval in almost every case reported in the State Reports, wherein the question of recovery of moneys paid for taxes illegally assessed has been discussed, which the case of *Forbes* v. *Appleton* does not pretend to overrule, and is the one of the leading authorities upon which the learned Judge of the Court below rested his decision in these cases.

It cites also *Mays* v. *Cincinnati*, 1 Ohio St. 268, where money paid without objection was held to have been a voluntary payment, but by the very terms of the decision it is implied that if the plaintiff had not "paid the demand in silence," he might have recovered the amount. But the Supreme Court of the State of Ohio, so far as it has expressed itself, has done so most strongly and unequivocally in favor of this recovery, in deciding in *The Knox County Bank*, etc., v. *Doty et al.*, 9 Ohio St. 505, "that a payment after the issuance of an execution to prevent a levy upon or a sale of the property of the defendant in execution, is not such a voluntary payment as will preclude the party paying from setting aside the judgment for irregularity."

And in *Baker* v. *City of Cincinnati*, 11 Ohio St. 534, a per-

son wishing to give theatrical exhibitions paid a license of sixty-three dollars and fifty cents, which was a pre-requisite therefor. " Fearing prosecution for violating the ordinances of the city, and moved by the heavy penalties provided in said ordinance for violating the same," he paid under protest. Though the Court held that the tax was not illegal, and therefore not recoverable by him, yet it also held that the payment could not be considered voluntary, citing, to sustain that position, *Parker* v. *The Great Western R. Co.* 7 M. & G. 253 ; *Morgan* v. *Palmer*, 2 Barn. & Cres. 729, 734, 737 ; *Dew* v. *Parsons*, 18 Eng. Com. L. 87 ; *Colwell* v. *Tiden*, 3 Watts, 327 ; *Boston & Sandwich Glass Co.* v. *City of Boston*, 4 Metc. 181, 188 ; *County of La Salle* v. *Simons*, 5 Gilman, 513.

This Court then remarks (*Bucknall* v. *Story*, p. 598) that " these decisions—*Hayes* v. *Hogan*, *Falkner* v. *Hunt*, *Guy* v. *Washburne*—except *McMillan* v. *Richards*—place the doctrine upon the somewhat broad ground that if the tax be illegal and is paid under protest, it may be recovered back." If the ground is broad, it is one on which the most enlightened Courts of this country and England have rested their decisions. We believe it is not too broad, in contemplation of the fact that the money sought to be recovered remains in the hands of one who has no legal right to it, and that, to enable the party entitled to it to recover as against the party who has no legal claim thereto, the ground should be as broad as justice itself, or there will be a practical denial of justice, which it is the primary object of laws and courts to compel and administer. Upon what principle of right should such ground be narrowed ?

But the facts of the case of *Brummagim* v. *Tillinghast* present no analogy to the facts of this case. Therein a party purchased stamps of the Treasurer of the City and County of San Francisco, which, by reason of an act of this State, declared unconstitutional for some purposes, were believed by the agents of a steamer must be placed upon certain bills of lading, which they refused to sign unstamped. The plaintiff bought the stamps voluntarily, and then sued the Treasurer, because, under the Constitution of the United States, they were not necessary for that purpose. The Treasurer threatened nothing,

and coerced in no respect, and although the party protested, he could not compel the Treasurer to repay the money. The decision in that case, so far as it solved the question arising upon the facts therein, is not one that the plaintiffs here should be obliged to contend against.

Upon this examination of the successive decisions of this State up to the decision in *Bucknall* v. *Story*, we reach the conclusion that, " tested by these rules, and assuming that the assessment was void, the payment made by the plaintiffs must be deemed to have been " *involuntary.* On page 599 of that case, the Court reached, in the same phrase, the conclusion that the payments were " voluntary." If they were in that case voluntary, we judge them to have been so by reason of the facts of the case, and not by reason of a series of decisions affirming and strengthening each other, and neither overruling the other.

In *Brummagim* v. *Tillinghast* it is said : " It is the compulsion or coercion under which the party is supposed to act which gives him a right to relief." But is that phrase altogether conclusive ? Is it only that compulsion or coercion under which the party is *supposed* to act which gives him a right to relief ? And if he is not supposed by some one to act from certain facts as a source of duress, then is there necessarily no compulsion, and has he no right to relief ? Is it altogether a question of law ? May it not be a question of fact, what is the real compulsion or coercion ? And is it not palpably so in these cases ? But if the test is the compulsion or coercion under which the party is supposed to act, it is the apparent compulsion at the time these payments were made that existed as a matter of fact and law.

We are sustained by the decision of the New York Court of Appeals upon this point, and ask the Court's attention to the case of *Peyser* v. *Mayor of New York*, quoted herein.

The principle of law upon which we hold that this action is maintainable may be briefly expressed thus :

Whoever, in the assertion of his rights, is compelled to pay money not legally demandable, can recover it with interest. Variously expressed, this rule has been long recognized. Its application to varying circumstances sometimes confounds sim-

ple minds, and as men differ in their appreciation or expression
of language, so the form of the rule at times appears slightly
modified. This distinction, however, has always to be kept in
mind. That men dealing in ordinary business transactions on
the same plane are not in the same circumstances as those, one
of whom has, or appears to have, *colore officii*, an advantage or
power over the other, without taking any further proceeding in
law. As between men dealing on equal terms the rule is sim-
ply expressed, as a right to recover money paid on an illegal
demand, in order to obtain immediate relief of person or prop-
erty.

But in case of ordinary citizens wishing to maintain their
rights as against, or in spite of, the demands or acts of persons
in office, the spirit and expression of the best decisions make it
clear that the rule, as we have just expressed it, is the rule in
its purer form; for the right exists, and the action is maintaina-
ble where there is no person deprived of liberty, and no prop-
erty to be released, and the rule justly receives no modifications
from its application to the case of taxes levied upon real estate,
as we trust we shall ultimately succeed in making apparent.

As we view the circumstances and the law in its application
here, we believe that in either form the rule supports these
actions.

In nearly all the cases where the question of such recovery
has been thoroughly examined, the basis for the decision seems
to be laid in the case of *Morgan* v. *Palmer*, 2 Barn. & C. 729.
That "is an action to recover a sum of four shillings paid by
the plaintiff, who is a publican in the borough of Great Yar-
mouth, to the defendant, as Mayor of that borough, and claimed
by the defendant, as having become due to him on granting to
the plaintiff renewal of his license as a publican : *held*, 1. That
the defendant was not entitled to any such fee. 2. That the de-
fendant was not entitled under 24 Geo. II, chap. 44, to notice of
the action about to be brought against him, for that the fee
could not have been taken by him as a justice *colore officii*. 3.
That the payment was not voluntary so as to proclude the
plaintiff from recovering in this action."

The reason of the decision is partly in the expression of Ab-

bott, C. J., who said : "It has been well argued that the payment having been voluntary it cannot be recovered back in an action for money had and received. I agree that such a consequence would have followed had the parties been on equal terms. But if one party has the power of saying to the other 'that which you require shall not be done except upon the conditions which I choose to impose,' no person can contend that they stand upon anything like an equal footing. Such was the situation in this action."

There was no duress of person or goods. It was simply an assertion of a right to carry on what business he chose. If a license was necessary, he wished it without paying an illegal demand. It may easily enough be said that the man there was not compelled to pay it; that there was no legal duress because he wasn't obliged to carry on the business of a publican ; he could have done something else for which the Mayor would not have demanded a license fee. But it was the plaintiff's right to pursue what business he chose, and to have a license without paying an illegal fee. The Mayor who received it had no right to it on the plainest principles of law, and in common honesty could not retain it. The law as expressed in that case has been examined, and applied, and confirmed, and undoubted, in almost all the Courts of the highest resort among English-speaking people. Every attempt to narrow the circumstances of its application, or to place obstacles to its broad and free exercise, is an attempt to deprive the citizen of his rights, and to support those temporarily endowed with a little power in the most arrogant, pretentious, and dangerous exercise of their little authority.

In the Supreme Court of the United States the principle has been confirmed. The principle sought for and found for the support of the actions was whether the party was compelled to make the payment. Sometimes in the cases reported it has been to get possession of goods, and sometimes to escape the payment of a penalty.

And the rule, as established in the United States Supreme Court, is " that taxes illegally assessed may always be recovered back if the Collector understands from the payer that the tax is

regarded as illegal, and that suit will be instituted to compel the refunding." (Chase, Ch. J., in *Erskine* v. *Van Arsdale*, 15 Wall. 75; *Maxwell* v. *Griswold*, 10 How. 242.) That Court excepts the case of the "purely voluntary payment without objection or notice not to pay the money over, or any declaration made to the Collector of an intention to prosecute him to recover back the money." But there the application is liberal, and leaves abundant opportunity to show whether the payment was really involuntary, as evidenced by a designation therein of the various acts of the tax payer, which would indicate it. (*Swartwout* v. *Elliott*, 10 Peters, 150.)

The question has been passed upon by the Court of Appeals of the State of New York—on the 25th day of September, 1877—so recently that the case has not yet been included in the Reports—but with so much learning, fairness, breadth, and liberality, by a united Court, and upon a state of facts strongly analogous to those of the cases at bar, and in two of the most material aspects of the case, that we ask the Court to examine it with the most serious consideration.

It is the case of *Peyser* v. *Mayor of New York*, S. F. Law Journal, vol. 1, p. 164. The Court therein makes pointed distinction between coercion in fact and coercion by law, and holds that money "involuntarily paid on an illegal assessment may be recovered back, and that if the assessment is regular on its face so that its collection can be enforced by seizure or sale, and evidence *aliunde* is necessary to show its invalidity, money paid thereon is paid involuntarily, or by coercion, or by coercion by law."

The facts are that "the plaintiff paid the amount of the assessment upon his property under protest. An action was brought by plaintiff and others, and the assessment was declared invalid, after which plaintiff brought this action to recover back the amount paid." In the opinion all concurred.

If any of the conditions which even this case demands, under a state of laws less liberal than we hold those of this State to be, do not exist in the cases at bar, they have escaped our notice. If there were any, it would be the absence of a reversal of the assessment before suit brought; but we apprehend the

Court will scarcely consider that to obtain, in the face of the decision which we now desire recalled, in which the assessment is declared to have been declared illegal in *Houghton* v. *Austin.*

The Supreme Court of the State of New Jersey, in the case of *Mayor of Jersey City ads. Riker*, 9 Vr. 225, has applied the rule in terms of the utmost fairness and learning, and the decision commends itself for its firmness and sterling manliness of expression.

The question was considered in 1843 in the Supreme Court of the State of Vermont, in the case of *Henry* v. *Town of Chester*, 15 Vt. 460, where the facts were that the taxable property of the plaintiff had been subjected to a disproportionate assessment in making up the taxes of the town. "When demanded they were paid (p. 465) to the Collector, who had rate bills and warrants regular on their face, authorizing their collection." (*Babcock* v. *Town of Granville*, 44 Vt. 331; *Allen* v. *City of Burlington*, 45 Vt. 202; *Hunnewell* v. *Charlestown*, 106 Mass. 351; *Arnold* v. *Cambridge*, Ibid. 352; *Lima Township* v. *Jenks*, 20 Ind. 301; *Green* v. *Mumford Tax Collector*, 5 R. I. 475; *Judd et al.* v. *The Town of Fox Lake*, 28 Wis. 585; *Gillette* v. *City of Hartford*, 31 Conn. 351; *Cody* v. *Lennard Tax Collector*, 45 Ga. 85; *Grimm* v. *Weissenberg School Dist.* 57 Penn. St. 434; *Tuttle Jr.* v. *Everette*, 51 Miss. 27; *First National Bank* v. *Watkins*, 21 Mich. 489; *Atwell* v. *Zeluff*, 26 Mich. 118.)

Hilliard on Taxation, p. 440, sec. 19, after examining the authorities, says: "As we have already seen, it is the prevailing rule, that payment to a Collector, who has a tax bill and warrant, in the form prescribed by law, is not a voluntary but a compulsory payment, and if illegally assessed the amount can be recovered back." See, also, p. 421, sec. 92.

Blackwell on Tax Titles, p. 165, says: "Where a county or other local corporation levy a tax which is illegal, and the citizen pays the tax to one who has a formal authority to collect it, the payment is not voluntary but compulsive, and an action will lie against the Collector to recover it back."

Here is the clear and no way uncertain expression of the highest Courts of England, the United States, and the States of

Vermont, Massachusetts, Rhode Island, Connecticut, New York, New Jersey, Ohio, Indiana, Wisconsin, Pennsylvania, Georgia, and Mississippi, unmistakably in our favor. Most of the cases are for the recovery of taxes levied upon real estate, and in some the record and the tax deed itself would display clearly the illegality of the tax and the invalidity of the deed. Yet these Courts give this remedy because law and right and justice demand and persuade.

We can scarcely add anything to the force of these decisions and authorities. It seems clear from them that the right to recover is undeniable, where the party pays an illegal tax because compelled to.

The point of the duress, we submit, lies in the mind of the tax payer. Did he pay voluntarily, without such reluctance as accompanies payment when the party knows the tax is illegal, and without protesting against the right of the Tax Collector to demand? It is against the right in the Tax Collector to demand and collect that he protests, and having collected the money, to retain it. Why should Courts attempt to make a distinction in the matter of the duress of the party—the operation of the tax payer's mind in paying his money, alike illegally assessed, whether the Tax Collector is to credit him with it on account of real estate or on account of personal property taxes? Is not the involuntary character of the payment itself the same, as he indignantly hands the money to the Collector, which he feels is being extorted from him? The consequences are slightly different in character, but it is the loss of personal property in one case, and in the other is the loss of real estate, or a practical, material damage by the injury to his chances to mortgage or sell the same. But the character of the payment, the feeling of necessity and compulsion to pay or suffer serious loss or injury, is exactly the same in the one case as in the other. Indeed, it is plainly all one case; for the payments were all made at one time—probably in most cases by one check. Is not duress a mental condition, and shall we say the tax payer was not really compelled to pay and did not pay involuntarily that part of his taxes known as the real estate assessment, because there may afterwards be other remedies or other ways by which—though

none without expense to himself—he may ultimately escape the worst result of not paying that part of his taxes, and still that there was duress as to personal property tax?

Does the Court propose to compel a tax payer to have no choice in the matter, but he must protect himself in but one way, and shall have no election by which he may be saved costs and damages?

*Brummagim* v. *Tillinghast* premises the possible difficulty of determining the question. If it is altogether a matter of law, and there is no duress but legal duress, it must at times be not only difficult to determine, but impossible. "There must be," says the Court, "some actual or threatened exercise of power possessed or supposed to be possessed by the party exacting or receiving the payment over the person or property of the party making the payment, from which the latter has no other means of immediate relief than by advancing the money." No one doubts the power or the exercise of it by the Tax Collector; and there is, we believe, nothing more absolutely certain in law in this State than that the tax payer actually had no other means of immediate relief than by advancing the money.

5. We make no extended argument to show that the threat of the Tax Collector, to add five per cent. additional to the amount of the taxes in case of non-payment before the first Monday in January, was a source of duress. To avoid this penalty, in addition to the burden of that which already operated as a lien upon all the property of the tax payer, he made the payment.

Many of the cases speak of the warrant in the hands of the officer which he was ready to execute. Our statute makes the labor less for the Tax Collector, and the coercion greater and more certain for the tax payer, by its provision that the tax operates as a lien of a judgment from the time of its assessment upon all the property of the tax payer. The Tax Collector needs no warrant, in such case, other than the assessment-roll, and no further proceeding at law in order to make sale of personal property or lands to collect the amount of the taxes and additional five per cent. and costs. And the language of the Court in *Preston* v. *City of Boston*, 12 Pick. 7, is applica-

ble: "Such warrant [assessment-roll] is in the nature of an execution running against the property and person of the party, upon which he has no day in Court, no opportunity to plead and offer proof, and have a judicial decision of this question of liability." (*Hunnewell* v. *Charlestown*, cited above.)

There are several adjudications determining the payment to avoid the additional penalties of the law alone to be payments under coercion. In *W. U. Tel. Co.* v. *Mayes, Treasurer of Hamilton County*, 28 Ohio St. 521, it was held that "where a corporation is assessed on its gross receipts, under the provisions of 'An Act for the Assessment and Taxation of Express and Telegraph Companies,' (S. & S. 769–771) and pays such assessment to avoid the penalties and disabilities incurred by a refusal to pay, but under protest and after notifying the Treasurer that an action would be brought to recover back; such payment is not voluntary, and an action may be maintained to recover back the amount so paid, if the tax is illegal." (Citing *Stephan, Treas.* v. *Daniels et al.*, 27 Ohio St. 527, and *Baker* v. *Cincinnati*, 10 Ohio St. 536.) In *Preston* v. *Boston*, 12 Pick. 7, it is held that "if a person pay an illegal tax in order to prevent the issuing of a warrant of distress with which he is threatened, and which must issue of course, unless the tax is paid, the payment is to be deemed compulsory and not voluntary." The case of *Maxwell* v. *Griswold*, 10 How. 255, held that the plaintiff who paid to avoid additional penalties could recover the amount paid, and a like decision was made in *Granville* v. *Babcock*, and *Baker* v. *Cincinnati*, above quoted.

But considering the peculiarity of the statute of this State, we believe ourselves justified in taking the position taken by Platt, B., and Martin, B., in *Steele* v. *Williams*, cited above, that in California there can scarcely be such a thing as a voluntary payment of taxes. The law commences its work by duress and coercion. The tax payer is always in the position of having the Tax Collector with assessment-roll [warrant] threatening him, ready and certain to add five per cent., not at some future time in his individual discretion, but on and after the first Monday of January, if the tax payer does not before that time redeem his land from the lien which fastened upon it the

day the assessment was made, and threatening and certain to sell and increase his burdens, and to place thereon a cloud in fact, if not a cloud in law, if he does not pay and does not redeem from sale before that other day, certain and inevitable as the statute and the passage of the time can make it. And it is not essential that there should be any other coercion or duress made evident by proof.

This Court has denied the tax payer the right of enjoining the sale. He pays under protest, to save his rights and contest the validity of the tax afterwards. If he does not pay, the amount is pretty certain to come from the purchaser at the tax sale, because he knows well enough that, though the tax is illegal, yet the tax deed will give him something as substantial to sell and bring him money, as if it were what the Courts call a legal cloud. Is the law then to be satisfied, if the Government but gets the amount of the tax, whether the tax payer pays it, to whom it will, under these circumstances, refuse to return it, or the buyer at the tax sale, who should not have given his money for an invalid certificate or deed, and who, of course, cannot recover?

But the tax payer asks his counsel for the remedy in case he pays, or how else, in fact, to save his rights; but we must tell him he cannot get his money back if he once pays it, and if he does not pay, he must run the risk of losing his lands—that there is no such thing in this State as paying beforehand merely to save his rights. Is it then the case that the exigencies of any Government can be so great that it should not be compelled, by adverse judicial decisions, to levy its taxes in a legal manner only, to employ only intelligent and honest official servants, and the people be taught that the rights of a citizen are equally as secure and sacred as the demands of the people?

We believe the tax payer should be, and is, under the law, allowed to pay his taxes, whether upon personal property or real estate, whenever he chooses, but protesting against their illegality and notifying the Tax Collector that he shall bring suit to recover them. If he cannot do this, he is utterly without remedy. For, to be allowed the privilege of a suit to enjoin the giving the deed, after the proper proofs, is practically to be

forbidden his rights; because, in case he shall have misapprehended the facts in the latter action, he will have lost his property, for the time of redemption will then have expired.

We respectfully submit that the conclusions are inevitable, that the rule as expressed in the common law, and as modified by the Code of this State, sustains the present actions; that the defendant should not be allowed to withhold those moneys, which by law he could not rightfully get, and by common honesty cannot rightfully retain; that he can hold them only by the right of might and possession—the tyranny of the brute and the savage, which holds on, " because the good old rule sufficeth them, the simple plan, that they should take who have the power, and they should keep who can."

*A. & H. C. Campbell*, also for Respondent.

By the COURT:

If the plaintiff's land had been sold by the defendant as Tax Collector for the alleged taxes, and a tax deed had been made to the purchaser, would the deed have been void on its face? For if so, it would have imposed no cloud on the plaintiff's title, and the threat to sell would not, under such circumstances, have amounted to legal duress. (*Bucknall* v. *Story*, 46 Cal. 589.) The only authority in law there was for the levy of a State tax for the fiscal year 1872–3, is to be found in sec. 3696 of the Political Code as it then stood. That section was under review by this Court in the case of *Houghton* v. *Austin*, 47 Cal. 646, and it was decided that so much of the section as authorized the State Board of Equalization, in determining the rate of the State tax, to make an allowance for delinquency in the collection of taxes, was unconstitutional and void. The exigency of the case did not require the Court to decide, and it did not decide, whether the whole section was void on its face. But we think the logical result of the decision is, that the whole section was unconstitutional and void *per se*. The clause requiring an allowance to be made for delinquency in the collection of the tax is so blended with the remainder of

the section, and the several clauses are so dependent on each other, that they must all stand or fall together.

The rule applicable to this point is forcibly stated by Chief Justice Shaw in *Warren* v. *Mayor of Charlestown*, 2 Gray, 98, who, after stating the general proposition that some portions of a statute may be held to be constitutional, while another portion may be pronounced void, and that in certain cases the valid portion may stand and the other be rejected, proceeds to say that "this must be taken with this limitation, that the parts, so held respectively constitutional and unconstitutional, must be wholly independent of each other. But if they are so mutually connected with and dependent on each other, as conditions, considerations, or compensations for each other, as to warrant a belief that the Legislature intended them as a whole, and that, if all could not be carried into effect, the Legislature would not pass the residue independently, and some parts are unconstitutional, all the provisions which are thus dependent, conditional, or connected, must fall with them." This case was quoted with approval in *French* v. *Teschemacher*, 24 Cal. 548; and doubtless states the law correctly. Tested by this rule, the whole of sec. 3696 was void *per se*.

The statute authorized the State Board of Equalization to determine the rate of taxation, coupled with the condition that it should make an allowance for delinquency in the collection of the tax. The power was to be exercised only on this condition, and the condition having failed on constitutional grounds, the power to determine the rate fell with it. In other words, the two clauses were "dependent, conditional, or connected," in the language of Chief Justice Shaw, and must stand or fall together. This becomes the more apparent, from the fact that if the clause requiring an allowance for the delinquency be stricken out, the State Board of Equalization has no authority to fix any rate of taxation, except such as would produce the requisite amount of revenue, on the hypothesis that all the taxes would be paid; and as there will always be, under our revenue system, (as is demonstrated by long experience) a considerable delinquency in the collection of taxes, the necessary result would be that the rate fixed by the Board, and the only

rate which, by the terms of the statute, they had the right to establish, would be insufficient to produce the required amount of revenue.

But we need not elaborate this point further, as it is obvious, we think, that no portion of the section can stand if the clause relating to the allowance for the deficiency be stricken out; and the necessary result would be that the Tax Collector's deed would have been void on its face.

Sec. 3786 of the Political Code required the Tax Collector's deed to recite amongst other matters that the land was sold for taxes, "giving the amount and year of the assessment." The deed, therefore, would have shown on its face that it was for a State tax purporting to have been levied for the fiscal year of 1872–3, whereas, as has been shown, there was no valid law authorizing a State tax to be levied or collected for that year. The deed would therefore have been void on its face, so far as it related to the State tax.

Nor would it have been otherwise if it had appeared on the face of the deed that the same land was sold at the same time to the same purchaser for a valid municipal tax. It is a familiar rule that if land be sold for taxes a part of which are valid and a part illegal, the whole sale and the tax deed will be void.

For these reasons, we are of opinion that when the plaintiff paid the money to the defendant he was under no legal duress, and the payment must be deemed to have been voluntary. In such cases, it is well settled that the money cannot be recovered back; and the judgment in the Court below should have been for the defendant.

Nor do we see any reason for remanding the cause for a new trial. It is evident the plaintiff could not improve his case on another trial.

Judgment and order reversed, and cause remanded, with directions to the Court below to dismiss the action.